# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 19, 2011

No. 10-50313

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARIA DE LOURDES CANTU,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
(07-CR-844)

Before HIGGINBOTHAM, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Maria de Lourdes Cantu urges that her written confession must be suppressed as the fruit of an unconstitutional search and an unwarned interrogation. She appeals the district court's ruling that the written statement was admissible because it came after a separate, intervening interrogation by a second law enforcement agency following a properly administered *Miranda* warning. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-50313

I

Defendant-appellant Maria de Lourdes Cantu was riding in the passenger seat of a vehicle driven by Jose Aguilar. Deputy Sheriff Ricardo Rios of La Pryor, Texas, stopped the car because it failed to come to a complete stop at a stop sign, it lacked a registration sticker, and it had a permanent license plate in the front but only a temporary plate in the rear. The missing registration sticker and mismatched plates led Deputy Rios to suspect the vehicle may have been stolen. As he approached the vehicle to request the driver's license and registration, Rios observed at least six air fresheners in the car, suggesting an effort to mask the odor of narcotics.

Deputy Rios testified in the district court that Aguilar failed to make eye contact during the stop, he exhibited nervous behavior, and his insurance card and license bore different names. Rios asked Aguilar to step out of the car. Aguilar told the officer that he was driving to San Antonio to buy clothes for his son, but he could not remember the boy's name. He told the officer that the car was owned by the person whose name appeared on the insurance card, but Aguilar did not know who that was. Aguilar also told the officer that the female passenger was his wife. Deputy Lopez arrived to assist, and Rios went to question Cantu. Cantu stated that Aguilar owned the vehicle and that he was a friend of hers.

Aguilar consented to a search of the car. Rios observed two bags on the floor near the front passenger seat, one of which appeared to be a purse. Both bags were zippered shut. Rios asked Cantu if the bags belonged to her, and she confirmed that they did. He then searched the bags. Deputy Rios did not request Cantu's permission to search her bags, although she did not object. Inside the bags Rios discovered small amounts of marijuana and rolling paper. When asked, Cantu admitted the marijuana belonged to her. Rios arrested

2

No. 10-50313

Cantu, then informed Aguilar he was requesting a canine unit to check the vehicle for any concealed narcotics.

While other officers waited for the dog to arrive, Deputy Rios put Cantu in a patrol car and drove her to the sheriff's office. He had not yet informed her of her *Miranda* rights.[1] During the drive, Rios told Cantu that she should "help herself out" and that "if there are any more narcotics in the vehicle, you know, and stuff like that we should know about, I mean, you should let us know." Cantu responded that she believed there may be other narcotics in the vehicle.

The canine alerted immediately to the vehicle. The handler allowed the dog to enter through the front driver's side door; the dog jumped to the back seat and alerted to the floorboard. The officers then noticed that the front seats were not properly bolted down. After removing the seats, they discovered a hidden compartment underneath the passenger's seat containing several kilograms of cocaine.

Deputy Rios reported the seizure of cocaine to Officer Gerardo Fuentes, a local officer deputized to a federal Drug Enforcement Agency task force. Officer Fuentes and two other DEA officers came to the sheriff's office later that afternoon. After first discussing the case with Deputy Rios, the DEA officers interviewed Cantu. That interview began approximately 4.5 hours after Deputy Rios's conversation with Cantu in the patrol car. All three DEA officers were wearing plain clothes, distinguishing them from the sheriff's deputies who conducted the traffic stop, and no sheriff's office personnel were present during the DEA interview.

The DEA officers informed Cantu of her *Miranda* rights and asked if she was willing to waive those rights; Cantu agreed and signed a written waiver.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Dickerson v. United States*, 530 U.S. 428 (2000) (reaffirming *Miranda*).

No. 10-50313

The officers then spoke with Cantu for about an hour, reporting that she was "very cooperative" during the interview. She told the officers that she had an intermittent romantic relationship with Aguilar and that she suspected he was involved in narcotics trafficking. She said she knew there were drugs in the vehicle, but claimed she did not know what kind of drugs they were, where in the vehicle they were located, or what Aguilar planned to do with them. At the end of the interview, the officers asked if she was willing to provide a written statement.[2] When Cantu agreed, she was given writing supplies and left alone inside an office to prepare her statement, which she gave to the officers approximately 1.5 hours later.

Cantu moved before trial to suppress the drug evidence, her unwarned statement to Deputy Rios, and her written confession to the DEA officers.[3] The district court held that the search of Cantu's bags violated the Fourth Amendment and suppressed the marijuana evidence. It also ruled that the statement made to Deputy Rios was inadmissible as the product of an unwarned interrogation. However, the district court refused to suppress the cocaine evidence, explaining that the passenger in an automobile does not have standing to challenge the legality of a search of the vehicle,[4] and also refused to suppress the written confession, finding there had been sufficient attenuation of the taint from the earlier illegality.

Following a single-day jury trial, Cantu was convicted of possession with intent to distribute five kilograms or more of cocaine and of a corresponding

---

[2] According to Officer Fuentes, it is "possible" that Cantu was told that if she cooperated he would recommend she be released on bond, although he did not specifically recall any officers telling her this.

[3] Cantu did not move to suppress her oral statements to the DEA officers, nor did she object when those statements were introduced at trial.

[4] *See, e.g.*, *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003); *United States v. Runyan*, 275 F.3d 449, 457 (5th Cir. 2001). Cantu does not challenge this ruling on appeal.

4

No. 10-50313

conspiracy count. She received concurrent sentences of 121 months. Cantu now appeals her judgment of conviction, challenging the admission of her written confession.

## II

*Oregon v. Elstad* holds that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[5]   The *Elstad* Court rejected the argument that statements made in a properly conducted interrogation must be suppressed because the defendant "'let the cat out of the bag'" in an earlier, inadmissible interrogation.[6] Because Cantu was given a proper *Miranda* warning at the start of her DEA interview, *Elstad* instructs that her written confession at the end of that interview is admissible despite the earlier, unwarned interrogation by Deputy Rios.

The Court later held in *Michigan v. Seibert* that the administration of a *Miranda* warning may fail to cure the illegality when police employ a two-stage interrogation procedure designed to end-run *Miranda*, with the second interrogation serving only to ratify statements obtained in an unwarned interrogation.[7] Unlike in *Seibert*, however, there was little continuity between the two interrogations in this case.[8] Deputy Rios asked his questions in his patrol car, whereas the later DEA interview was conducted in a different

---

[5] 470 U.S. 298, 314 (1985).

[6] *See id.* at 311 (quoting *United States v. Bayer*, 331 U.S. 532, 540–41 (1947)).

[7] 542 U.S. 600 (2004).

[8] *Cf. id.* at 615 (plurality opinion); *id.* at 621, 622 (Kennedy, J., concurring in the judgment).

No. 10-50313

location by different personnel working for a different agency. There was a 4.5-hour break between the two interrogations, and the DEA agents in their interview did not exploit or refer back to Cantu's earlier statement. Under the circumstances here, we conclude that the DEA interrogation and the resulting confession were not impermissibly tainted by Deputy Rios's earlier *Miranda* violation.

## III

The district court also determined that the warrantless search of Cantu's bags violated the Fourth Amendment, but found this illegality sufficiently attenuated by the end of the DEA interview that it did not taint the written confession. When weighing the attenuation of the taint from an illegal search, we consider "'the temporal proximity of the illegality and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'"[9]

## A

The district court held that Deputy Rios's search of Cantu's bags was unconstitutional under this court's decision *United States v. Jaras*.[10] In *Jaras*, police received consent for a search from the driver of a vehicle, leading them to two suitcases in the trunk. The driver told the officers that the suitcases belonged to his passenger, Jaras. The officers told Jaras that they had permission from the driver to search the car, then proceeded to open the

---

[9] *Rawlings v. Kentucky*, 448 U.S. 98, 107 (1980) (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)); *United States v. Miller*, 608 F.2d 1089, 1102 (5th Cir. 1979).

[10] 86 F.3d 383 (5th Cir. 1996).

suitcases, with Jaras neither consenting nor specifically objecting to the search.[11] We held that the search of Jaras's suitcases violated the Fourth Amendment because the driver had neither actual nor apparent authority to consent to a search of his passenger's property[12] and because Jaras's "mere acquiescence" could not be construed as voluntary consent when officers never asked for his permission.[13]

The Government argues that the search was permissible under *United States v. Navarro*,[14] but *Navarro* is distinguishable. In that case, as in *Jaras*, a driver consented to a search of his vehicle, which contained a closed duffle bag on the back seat. Unaware that the duffle bag belonged to a passenger, police opened the bag and found methamphetamine.[15] We distinguished *Jaras* and allowed the contents of Navarro's duffle bag to be admitted because the officers in *Navarro* had "no indication" that the bag belonged to someone other than the driver.[16]

Deputy Rios knew that the bags he found belonged to Cantu, not the driver. She told him so. While the officers in *Navarro* may have reasonably

---

[11] *Id.* at 386.

[12] *Id.* at 389–90; *see also United States v. Infante-Ruiz*, 13 F.3d 498, 505 (1st Cir. 1994) (driver's consent does not allow police to search briefcase identified as belonging to the passenger); *United States v. Welch*, 4 F.3d 761, 764–65 (9th Cir. 1993) (driver's consent does not permit police to search his girlfriend's purse found in the trunk).

[13] *Jaras*, 86 F.3d at 390–91 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968)); *see also United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990) (en banc) (holding that the Government must prove consent by a preponderance of the evidence).

[14] 169 F.3d 228 (5th Cir. 1999).

[15] *Id.* at 230.

[16] *Id.* at 232.

No. 10-50313

believed that the duffle bag belonged to the consenting driver,[17] the officer here—like the officers in *Jaras*—knew the closed bags belonged to a passenger who had not given consent. The district court correctly ruled that the search of Cantu's bags was unconstitutional.

The government further argues that, even if the search was illegal, it was not particularly flagrant. We disagree. There is nothing unclear about *Jaras*, which has been the law of this circuit for almost 15 years. Deputy Rios had no authority to search inside Cantu's closed bags without her consent, which he neither sought nor obtained. And he knew the bags he was searching were hers.

While the illegality of the handbag search was plain, the nexus between the evidence it produced and Cantu's confession is weak.[18] The cocaine hidden under the floorboard was several steps removed from the marijuana found in her purse. Nothing suggests that Deputy Rios searched Cantu's bags to gain leverage to exact her confession to *other* drugs in the car, nor did his discovery that she had possession of a small quantity of marijuana compel her to confess to possession of a large quantity of cocaine when it was later found.

B

The Government contends that the taint of the illegal search was sufficiently attenuated by the intervening DEA interrogation and its accompanying *Miranda* warning. When a confession is obtained following an unconstitutional search, the Constitution "requires not merely that the statement meet the Fifth Amendment standard of voluntariness[,] but that it be

---

[17] *Cf. Herring v. United States*, 555 U.S. 135 (2009) (holding that isolated, good-faith errors by police do not trigger the exclusionary rule).

[18] *Cf. United States v. Sheppard*, 901 F.2d 1230, 1236 n.11 (5th Cir. 1990) (noting a "lack of nexus between the purpose of the police conduct and either what was disclosed thereby, the consent, or the evidence in issue").

No. 10-50313

'sufficiently an act of free will to purge the primary taint.'"[19] We have identified the administration of a *Miranda* warning as one significant factor in this analysis,[20] but a *Miranda* warning alone will not always suffice to purge the taint of an unconstitutional search or seizure.[21]

In this case, the full circumstances of the DEA interrogation served to attenuate any effect from the earlier misconduct. The *Miranda* warning made clear that Cantu was under no obligation to talk to the police, even if asked to confirm or deny information the police already knew. Further, the DEA interrogation was performed by federal officers, not the sheriff's deputies who conducted the traffic stop, and neither Deputy Rios nor any other sheriff's office personnel participated in the DEA interview. The DEA officers wore plain clothes rather than police uniforms, distinguishing them from the sheriff's deputies. Although the DEA interview took place at the sheriff's office, it was well removed in time and location from the traffic stop and the patrol car where the earlier misconduct took place.

In short, the DEA interrogation was conducted in a "different place[] . . . with different people in a different atmosphere" than the illegal search.[22] By distancing the DEA interview from the earlier misconduct, these circumstances

---

[19] *Brown*, 422 U.S. at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

[20] *See, e.g.*, *United States v. Basey*, 816 F.2d 980, 995 (5th Cir. 1987) (noting that "the curative power of *Miranda* warnings may be given great weight in some situations," so "we review repeated efforts to inform [a defendant] of his rights as a factor tending to support the conclusion that his statements . . . were an act of free will" (citing *Elstad*, 470 U.S. at 298)); *see also Rawlings*, 448 U.S. at 98 (describing *Miranda* warnings as "important, although not dispositive").

[21] *Brown*, 422 U.S. at 601; *United States v. Webster*, 750 F.2d 307, 324 (5th Cir. 1984); *Miller*, 608 F.2d at 1102; *cf. Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (three *Miranda* warnings not enough to purge taint of illegal arrest).

[22] *United States v. Richard*, 994 F.2d 244, 252 (5th Cir. 1993).

created an "atmosphere . . . more conducive to an act of free will."[23]  That willful act—Cantu's knowing and voluntary decision to give a written confession—purged any remaining taint from the earlier illegality, weighing heavily in favor of admitting the confession.

C

Approximately seven hours passed between the search of Cantu's purse and the receipt of her written confession.  This is a relatively short period of time, but not exceptionally so.  The Supreme Court held in *Taylor v. Alabama* that a six-hour interval was not long enough to purge the taint where the suspect "was in police custody, unrepresented by counsel, and . . . questioned on several occasions, fingerprinted, and subjected to a line-up."[24]  The time interval here was roughly similar, but Cantu spent most of her detention at the sheriff's office in a room by herself.  Unlike the defendant in *Taylor*, who was subject to constant interruption, Cantu had approximately 4.5 hours preceding the DEA interview when she was not under interrogation.  In contrast to *Taylor*, the Court held in *Rawlings v. Kentucky* that a period as short as 45 minutes may help to attenuate the taint if the suspect is held in a "congenial atmosphere."[25]

We are persuaded that the district court properly admitted the written confession in this case.  The judgment of conviction is AFFIRMED.

---

[23] *Id.*

[24] 457 U.S. at 691.

[25] 448 U.S. at 107–08.